# UNITED STATES DISTRICT COURT

### for the

### Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. *1:14 m J 7* |
| Peter Millar LLC 4300 Emperor Blvd., Suite 100 Durham, North Carolina | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A hereto

located in the _____Middle_____ District of _____North Carolina_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, USC, Section 541 | Entry of Goods Falsely Classified |
| Title 18, USC, Section 542 | Entry of Goods by Means of False Statements |

The application is based on these facts:

See Attached Affidavit of James C. Malone

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent James C. Malone
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____01/24/2014_____

_____
*Judge's signature*

City and state: Winston Salem, North Carolina

JOI ELIZABETH PEAKE, U.S. Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

James C. Malone, Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), first being duly sworn, deposes, and says:

### Introduction

1.   I am a "Federal Law Enforcement Officer" within the meaning of Rule 41 (a) of the Federal Rules of Criminal Procedure, and Section 2510 (7) of Title 18, United States Code, and empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18 and Title 19 of the United States Code.

2.   I have been employed as a Special Agent with DHS-HSI, formally known separately as the U.S. Immigration and Naturalization Service and U.S. Customs Service, for over 21 years. Since becoming a federal agent working with DHS-HSI, I have conducted numerous investigations that included the execution of search warrants relating to violations of the Immigration and Nationality Act and Titles 8, 18, 19, and 21 of the United States Code.

3.   The information in this affidavit is based upon information I have learned during the course of this investigation and through the review of official reports. Because this affidavit is for a limited purpose, I have not included every fact I have learned about this investigation. I have set forth only the facts necessary to establish a foundation for the requested warrant and to show probable cause that evidence of violations of Title 18, United States Code, Section 541 –entry of goods falsely classified – and Section 542

- entry of goods by means of false statements - is located at a premises located at 4300 Emperor Blvd., Suite 100, Durham, North Carolina (hereinafter referred to as the SUBJECT PREMISES).

## Legal Requirements on Importation of Goods Into the United States

4.     Based on my knowledge, training, and experience, all entities (including businesses and individual persons) that import commercial quantities of goods into the United States must declare to DHS U.S. Customs and Border Protection (CBP) the goods being imported and their value.   The process of importing goods into the United States is governed by Title 19, Code of Federal Regulations (CFR), Section 142.3.   Per these regulations the importer must file the following documentation at time of entry:

- CBP Form 7501 or CBP Form 3311 (documents that summarize the importation);

- a commercial invoice (describing the goods imported and their true monetary value as well as information about the importer); and,

- a bill of lading and a packing list upon of arrival of said goods.

The importer must then pay to CBP any import duties levied on the import according to the Harmonized Tariff Schedule maintained by the U.S. Federal Trade Commission.   Per Title 19 CFR 163.4, all commercial importers must maintain importation documentation for five years after the date of the importation.

## Synopsis

5.     On November 14, 2013, DHS HSI received an anonymous tip that Peter Millar LLC (or "the company"), a company operating at 4300 Emperor Drive, Suite 100, Durham, North Carolina, was in the business of importing luxury sports apparel.  According to this tip, Peter Millar LLC was committing import fraud by undervaluing the apparel being imported into the United States.

6.     This tip further described the scheme: Peter Millar LLC would pay an overseas vendor up to a 50% deposit for the manufacture of apparel.  When this order was complete, the vendor would ship the item and send Peter Millar LLC an invoice for the remaining 50% balance.  Peter Millar LLC would then file a customs entry on the importation utilizing this invoice showing the value of the merchandise at 50% of true value. Peter Millar LLC would then pay any import duties owed using this 50% valuation of goods.

## Probable Cause

7.     On January 13, 2014, the HSI Resident Agent in Charge (RAC), in Raleigh, North Carolina, developed a source of information (SOI) that had maintained employment at Peter Millar LLC for several years.  On January 14, 2014, I interviewed this SOI regarding criminal activities of the company.  During this interview the SOI told me the following:

7a. He/she had worked at the company from 2011 until late September 2013 when the SOI ceased employment at the company.  The SOI stated that he/she worked directly under the company's Chief Financial Officer (CFO) Kim Mattoon. The SOI stated that he/she worked as an import specialist

in an administrative position and had direct knowledge of the filings of import documents by Peter Millar LLC to CBP regarding importation of apparel goods. The SOI stated that that he/she directly dealt with brokers and freight forwarders on the importation activities of the company.

7b. According to the SOI, the company imports sports apparel, more specifically golf apparel. The importations consisted of approximately one-third containerized goods where the company would import full 20 or 40 foot containers of apparel into the United States. The other two-thirds of imports consisted of consolidated shipments where the company would utilize a shipping company such as Federal Express to import items.

7c. According to the SOI, the company designs the apparel in the United States and then contracts with approximately 42 vendors outside the United States to manufacture the items. When the company decides to have a vendor manufacture an item, it issues a purchase order via email to the vendor and orders the items. The vendor then generates an initial invoice and requires the company to pay a 25% to 50% deposit on the ordered items. Peter Millar LLC would then wire transfer this deposit to the vendor using a company bank account at Wells Fargo bank specifically designated to pay overseas vendors. According to the SOI, these wire transfers would refer to the purchase order number, as the wire transfer often include payments to other vendors under different purchase order numbers. Vendors then generally had 90 days to ship the items ordered. Upon shipment, the vendor would submit a new invoice to the company requesting the 50% to 75%

balance due. According to the SOI, the company would then report this new invoice amount as the declared value on the CBP Form 7501 along with the supporting entry summary documents (e.g., commercial invoice, bill of lading, packing slips, etc.). The source stated that this was done to avoid paying up to 30% in import duties on the on true value of the imported apparel. Once the goods were received the company would then wire transfer the vendor a second payment referring to the original purchase order. The SOI stated that the undervaluing of imports was done with full knowledge and approval of CFO Kim Mattoon and other managers at Peter Millar LLC.

7d. According to the SOI when he/she was employed at Peter Millar LLC, she worked at the SUBJECT PREMISES, where he/she utilized desk and other office computers to communicate with management, vendors, and other employees regarding purchase orders, bank wire transfers, and other day-to-day communications surrounding business operations. Upon his/her departure from the company he/she did not take any computers or information off of the computers with him/her. To the best of his/her knowledge those computers and information contained therein remain at the SUBJECT PREMISES. The SOI confirmed that the company is headquartered and operates out of the SUBJECT PREMISES. As a result, virtually all documents, as well as computers, necessary to run the business and all historical records the company is required by law to maintain are kept at the SUBJECT PREMISES.

7e. On January 23, 2014 agents again met with the Source of Information (SOI) and gleaned the following information:

i. That in his/her capacity of employment at Peter Millar LLC, he/she was in control and possession of the customs import (Entry) documents/records. The SOI stated that all other records including Vendor contracts, cost sheets, wire transfers, and other correspondence were kept in files located in the accounting section of the company and managed by "Lucia".

ii. The SOI stated that unless you took the entry document from his/her section over to accounting, and matched the Purchase Order (PO) numbers with information contained in the cost sheets, and vendor contracts, you would not see any discrepancies. When agents asked the SOI if in his/her experience records were normally compartmentalized in such a manner, he/she stated "no." In his/her experience all of the entry documents, cost sheets, wire transfers, vendor contracts would all be located in one file. The SOI stated that this was the normal procedure because otherwise you would not be able to reconcile your records, and if you were audited, you would not see the discrepancies.

iii. The SOI stated that numerous records are housed and managed in a computer software system called "Blue Cherry", which the SOI described as a Microsoft inventory/accounting control system that contains information on the vendor accounts, including the cost sheets for each purchase order to include the wire

transfer information, and the payment of commissions to third party vendors.

iv. The SOI stated that if you obtained the entry records file, and then reconciled it with either the hard copy files kept in accounting, or the Blue Cherry records from the computers, comparing the cost sheets, wire transfers, and vendor contracts, with the dollar amounts indicated on the entry documents, you would see the discrepancies of 20-50% of the valuation of the goods being imported into the United States.

v. The SOI stated that in addition to issues surrounding imports during his/her tenure with the company, he/she also examined import records at the company regarding importations by the company prior to her employment as far back as 2009, and noticed the same errors and discrepancies. The SOI stated that when he/she had a conversation with the Chief Financial Officer (CFO) Kim Mattoon, and explained there were problems with the valuations of entries, Mattoon stated something to the affect that "we're a small company; they will never look at us", and "fix what you can fix, and what you can't, don't worry about."

8. On January 16, 2014, I reviewed documentation from the North Carolina Employment Security Commission (ESC) relating to employment records for Peter Millar LLC. All wages paid by employers to employees in the State of North Carolina are reported to the ESC. A review of these records determined that the SOI was employed at the company until late 2013 and based on the amount of wages reported to ESC I believe that the SOI was

being truthful when stating he/she was employed in an administrative position at Peter Millar LLC.

## Corporate Records and Website

9. On January 22, 2014, I conducted a record check through the North Carolina Department of the Secretary of State, Corporations. As a result of this check, I found that Peter Millar LLC was incorporated on April 9, 2009 in North Carolina and is listed as an active, perpetual limited liability company. According to the corporate records filed for 2013 (certification of annual report), Peter Millar LLC, listed their "principal office street address" as 4300 Emperor Blvd., Suite 100, Durham, NC 27703.

10. On January 22, 2014, I conducted an examination of the Peter Millar LLC website which is located at the web address of petermillar.com. On a section of the website the company lists the address of 4300 Emperor Blvd., Suite 100, Durham, NC, 27703, as their corporate address.

## Analysis of Importation Records

11. On January 17, 2014, CBP Auditor Kristy Reuter conducted a computerized search of DHS databases for all imports initiated by Peter Millar LLC for calendar years 2011, 2012, and 2013. Analyst Reuter determined that the company averaged 566 imports per year with an average yearly value of $25,821,987.00. The analysis by Auditor Reuter also broke the imports down by country of origin for the said time period and the company imported apparel items from 19 countries, with the majority being from Asia via numerous vendors.

12.    On January 23, 2014, your affiant examined an entry package filed by Peter Millar LLC on June 19, 2013, where the company imported apparel and other clothing items valued at $52,808.00 from Korea.    An examination of this paperwork filed with CBP denoted that the SOI is listed along with Peter Millar LLC as the importer of record further corroborating the information provided by the SOI on January 14, 2014.

## Notification by Peter Millar LLC

13.    On January 21, 2014, the CBP Port Director of Raleigh, North Carolina, received a letter from the law firm of Williams Mullen stating that the firm had been retained to represent Peter Millar LLC and disclosing to CBP that from October 18, 2008, to January 20, 2014, the company had undervalued its importation of goods into the United States.    This letter requests 270 days so the company can review the entry paperwork to report to CBP any duties not paid to the United States.

## Initiation of Criminal Investigation

14. The office of the Resident Agent in Charge, Immigration and Customs Enforcement, Homeland Security Investigations formally opened a criminal investigation into Peter Millar LLC by initiating a case opening in the Treasury Enforcement Communications Systems (TECS) on January 15, 2014, which precedes the purported filing of prior disclosure from Williams Mullen.[1]    Additionally, on January 15, 2014, Group Supervisor

---

[1] A "prior disclosure" is a term of art defined under 19 C.F.R § 162.74(a)(1). A prior disclosure is made if the person concerned discloses the circumstances of a violation (as defined in paragraph (b) of this section) of 19 U.S.C. 1592 or 19 U.S.C. 1593a, either orally or in writing to a Customs officer before, or without knowledge of, the commencement of a formal investigation of that violation, and makes a tender of

Brian Padian sent an electronic communication to the Customs and Border Protection Office in Charlotte, North Carolina stating that ICE/HSI was formally opening a criminal investigation into Peter Millar LLC, and requested that CBP not notify Peter Millar of the investigation or communicate with Peter Millar LLC regarding any entry or other records filed by Peter Millar LLC.

15. Based on the above information, I submit that there is probable cause to believe that Sections 541 and 542 of Title 18 of the United States Code, have been violated, and that the property and items listed in **Attachment B** are to be located at the SUBJECT PREMISES, including evidence of this offense. Therefore, I respectfully request that this Court issue a warrant to search the SUBJECT PREMISES, more particularly described in **Attachment A**, and to authorize the seizure of the items described in **Attachment B**.

---

any actual loss of duties, taxes and fees or actual loss of revenue in accordance with paragraph (c) of this section. The effect of prior disclosure on a violation of 19 U.S.C. 1592 is purely civil in nature and does not provide a safe harbor for criminal conduct contained in violation of Title 18 U.S.C.§§ 541 or 542.

James C. Malone
Special Agent


Sworn to and subscribed before me


This 23th day of January, 2014


JOI ELIZABETH PEAKE
United States Magistrate Judge
Middle District of North Carolina

## Attachment A

The premises are located at 4300 Emperor Blvd., Suite 100, in the city of Durham, County of Durham, North Carolina, and are further described as a white office building with attached warehouse. The number "4300" is displayed on the side of the building, and the number 4300-100 is printed on the entry door to the building. Signage inside the windows of the office building denote the offices belonging to Peter Millar LLC.



## Attachment B

The items to be seized are evidence and instrumentalities of violations of Title 18, United States Code, Section 541 – entry of goods falsely classified - and Section 542 - entry of goods by means of false statements – by Peter Millar LLC from the period of April 9, 2009 to September 30, 2013, as follows:

1. Importation documentation including CBP forms filed with the United States, purchase orders, invoices, bills of lading, packing lists, and other documentation regarding the entry of foreign goods into the United States from April 9, 2009, to September 30, 2013.

2. Any documents, including electronic documents, such as bank account statements, professional or personal correspondence – including electronic mail or e-mail – from any entity, organization, or individual that would further identify importations into the United States by the company, the value of goods imported, the value of goods sold, and the identity of overseas vendors;

3. Any notices from CBP regarding importations of goods or from foreign governmental agencies regarding exportations, duties and tariffs on goods.

## Attachment C

## Computer Search Warrant Protocol

1.  This search warrant covers and controls the procedure for searching: (1) electronic or computer devices, related equipment or media located at the premises set out in Attachment A to locate and seize items listed on Attachment B ("Computers"). To the extent set out in Paragraph 3 below, agents are authorized to seize and remove from the premises such Computers, including computer system input/output (I/O) peripheral devices, software and media, so that a qualified computer expert can accurately search for and retrieve the data in a laboratory or other controlled environment when this is necessary. Agents and computer experts working with agents are authorized to seize the relevant system software (operating systems, interfaces and hardware drivers), any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices (including but not limited to passwords, keycards and dongles) in order to facilitate the authorized search. In addition, if necessary for data retrieval, they are authorized to reconfigure the system in order to accurately search for and retrieve the evidence stored therein.

2.  In regard to the search and inspection of Computers, agents are directed to analyze the electronically stored data, whether on-site or off-site in a laboratory or other controlled environment, by using techniques which serve to keep the search within the authorization of this warrant, such as: (a) surveying various file "directories" and the individual files they contain in order to locate evidence and instrumentalities authorized for

seizure by the warrant; (b) "opening" or reading the first few "pages" of such files or images in such files in order to determine their precise contents; (c) "scanning" storage areas to discover and possibly recover recently deleted data, and "scanning" storage areas for deliberately hidden files; and (d) performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

3. This warrant specifically requires an on-site search, or to the extent an on-site search is impractical or unreasonable, then the creation of a "mirror image" or "image" of a device, drive or media for use in an off-site search, unless such "mirror-imaging" is unreasonable under the circumstances. In general, imaging is the taking of a complete electronic picture of the devices or media, including all hidden sectors and deleted files, to obtain an exact copy of the device, drive or media's stored data without actually seizing the device, drive or media. The agent or an expert will then conduct an off-site search for information or data described in the warrant from the "mirror image" copy at a later date. In the event that mirror-imaging reasonably cannot be done under the circumstances, or cannot reasonably be done on-site under the circumstances, agents are authorized to seize and remove from the premises such electronic or computer devices but must return them to the subject premises within seven days of removal, absent further permission from the court.

4. Searching electronic or computer devices for criminal evidence can be a highly technical process requiring expert skill and a properly controlled environment. The vast array of

electronic and computer hardware and software extant may require a computer expert who specializes in specific systems and applications, all of which may be impossible to ascertain before the search. Moreover, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected or encrypted files. Because electronic and computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Consequently, to the extent set out in Paragraph 3, this warrant authorizes the temporary seizure of electronic or computer devices and their input/output peripheral devices, related software, documentation, data security devices (including passwords) and media so that a qualified computer expert can accurately retrieve the data in a laboratory or other controlled environment.

5. When an electronic or computer device, hardware, equipment, software or media has been seized for off-site search and analysis, the agents shall comply with Fed. R. Crim. P. 41(f) in the following manner. Following the initial search and seizure, the agents shall prepare the usual Rule 41(f) inventory of not only the property and items seized by them pursuant to the warrant, but also the information or data, which has, at that date, been identified as "seized" pursuant to the warrant. This inventory will identify each electronic or computer device, related equipment or media, which will be subject to further off-site, search for additional information. For example, if the agents make an on-site mirror image of a drive, device or media, for use in an off-site search, they need only list the

making of the mirror image in the return, with an indication that it is subject to further searching pursuant to this warrant. The listing of any data or information, which is "seized" from the media off-site, will then be made in the final inventory return. The agents shall give or leave a copy of the warrant and receipt of this preliminary inventory of property seized and make a return to the court, all as provided by Rule 41(f).

6. After completing the initial search and seizure and preparing the inventory, the agents are directed to immediately begin the off-site search and information retrieval process with respect to the electronic or computer devices, related equipment and media which have been seized and on which further data retrieval is continuing. The agents shall complete the search and data retrieval process within thirty days of the execution of this warrant (unless an extension of time is obtained by the government) and, at that time, prepare a final inventory of information or data seized by them during the off-site search and both deliver a copy of the final inventory of information or data seized by them during the off-site search to the person from whom or from whose premises the property was taken (if known) and make a return of the original final inventory to the court. The court will then attach this final inventory to the original search warrant and inventory return as an addendum. Because of the nature of electronic or computer information, the listing of "seized data" in the inventory return may be made by copying the "seized data" to a computer diskette or CD or DVD disc and submitting it, along with an affidavit which explains what is on the diskette or disc and the procedure used.

7.    If the owner of the seized items so requests, pursuant to Fed. R. Crim. P.41(g) the agents will, to the extent practicable, attempt to provide such owner with copies of any files, data or information, that may be necessary or important to such owner's legitimate activities.    The items seized are subject to the time limit and other terms for the return of seized property set forth above.

## Attachment D

## Protocol for Potentially Privileged Materials

1. Prior to the execution of the search, the United States Attorney's Office for the Middle District of North Carolina shall identify one Assistant United States Attorney to be a member of the taint team. Similarly, Homeland Security Investigations shall designate two agents to be members of the taint team: one investigative agent and one forensic examiner.

2. The members of the taint team shall have no prior involvement in the investigation and will have no further role in the investigation or prosecution of this case after review of the subject items, unless some further privilege issue arises requiring additional review or litigation. Everyone participating in the taint team review of the subject items shall review and be familiar with these procedures.

3. The taint team shall obtain from the prosecution team sufficient factual information about the nature and scope of the criminal investigation so that the taint team can conduct its review in a complete, thorough and professional manner. The taint team shall be responsible for the secure storage of all privileged information. The material shall be stored in a facility segregated from the other documents and tangible objects gathered as part of the underlying investigation. Access to the privileged information shall be limited to the members of the taint team. The taint team shall create and maintain a log showing the names of the members of the taint team and the dates and times when those members obtained access to the privileged information for review.

4. If it is anticipated that privileged information will be obtained during the course of a search, the taint team shall be present at the search location, if practicable. However, the

attorney members of the taint team shall not participate in the search itself. The agent members of the taint team shall participate in the search and take possession of the privileged information and shall conduct a preliminary review to determine whether the information is truly privileged, whether the privileged information falls within the scope of the search's lawful parameters, whether the privileged information is relevant to the investigation, and whether the privileged information is subject to some exception which would overcome the privilege.

5. The attorney member of the taint team shall provide legal advice and guidance to the agent and may participate in the review of the materials.

6. The taint team shall not disclose any of the privileged information to the prosecution team. Nor shall the taint team discuss its preliminary findings with respect to the information reviewed with the prosecution team.

7. Once the taint team has completed its preliminary review, any materials which the taint team determines clearly not to contain privileged information may be given to the prosecution team. Any materials which the taint team determines clearly to be privileged information for which there is no exception which would overcome the privilege, or is irrelevant, or is outside the scope of the lawful parameters of the search, shall be returned to the owner. The taint team shall not make or retain any copies of such privileged information. Any materials which the taint team determines to arguably contain privileged information or arguably to be subject to an exception to the privilege shall be submitted to the Court for a final determination of privilege.

2